The first case today is 162009 United States v. Hector Serrano-Acevedo and 162049 United States v. Helio Diaz Jimenez. Thank you. Mr. Sultan, good morning. Good morning, Your Honors. May I reserve one of my five minutes for rebuttal, please? Five minutes? One of my five minutes for rebuttal. I have five, Your Honor. I'd like to reserve one. Mr. Sultan, we'll give you a bit more time than that. It's very kind of you, Your Honor. Yes, and you may reserve one. Thank you very much. May it please the Court, the sole issue raised by my client, Virgilio Diaz Jimenez, on this appeal is one which this Court has faced repeatedly over the past 30 years, the constitutionality of a so-called protective sweep. In this case, after the defendant came outside his residence and was arrested, police entered that residence without a warrant and made inculpatory observations. Thereafter, they obtained from the defendant punitive oral consent to conduct a thorough search. This case is remarkably, on its facts, akin to the case decided by this Court last year, Delgado Perez, authored by Judge Barron. Your Honor, can I ask you one question with a possible point of distinction? In Delgado, we said that there was no basis for thinking that the individual who was brought outside the house had any Confederates who would have been local at the time. Here, as I understand, the government's position is that there was a reasonable basis for them suspecting that there was a third person involved. Now, as it happens, they've accounted for one of the co-defendants already, then they bring the second co-defendant out, and then there's a third person, his wife, that they also bring out of the house. It remains, at least in my mind, a question. I'm curious what your answer to it is. Why wouldn't it have been reasonable for the government to believe that the third person they suspected was involved, as a Confederate, was still in the house and was not the wife? Your Honor, I think that is the only possible way out for the government in this case, and so let me go through the relevant facts. There were two people who went into a bank and robbed a bank. Those two people were seen jumping into a white van outside the bank and fleeing. Shortly thereafter, two people were seen jumping out of that van and running into the woods. So far we're dealing with two, okay? An informant told the police that he knew the two people who were responsible for the robbery. Two. He gave them their names, he gave them their phone numbers. Thereafter, the police tracked those two phones using cell site information obtained or other information, GPS information obtained from the telephone company. So now the only person to testify at the hearing was Agent Rivera. He said that he assumed, based on his experience, that there was a third person involved in the robbery, a getaway driver. But when he was asked on cross-examination, did you have any facts about a third person? Did you have anything specific that supported that assumption? He said specifically, no, he did not. So this is essentially speculation, it's conjecture. Maybe there was a third person involved, but as this court said, in Delgado, the possibility that there might be a third somebody lurking in the house, that's not good enough. On Rui, you need specific and articulable facts. They didn't have any. The wife and the defendant came out of the house, they're outside of the house. They have no factual basis to believe there is anybody inside the house, let alone somebody who poses a danger. It struck me that if the third person was the driver of the white van, and the white van is left abandoned someplace, and two people, not three people, are seen out of it, that if there was a third person, that person would not have been in the van at the time it was abandoned, would have been let off some other place. And even if there was a third person, the assumption that they would be, that person would be at the house was a bit questionable. I completely agree with you, Your Honor. So there's no evidence that if there was this third person, that that third person went with the other two, who were seen running into the woods, through the woods, all the way through the woods, to the defendant's home. There's simply nothing that supports that. And there was no car in the driveway. There was nothing that supported the existence of a third person in that house, let alone a dangerous person. Therefore, Delgado controls. What do you do about the shortly subsequent consent if we accept the fact-finding that oral consent to search wherever, whenever, was given by your client? I think that's exactly the same as in Delgado, Your Honor. Delgado, they got the same thing. They got oral consent after they'd already found the inculpatory evidence, immediately after. And this court held that's invalid consent, as in many other cases. Consent obtained right after an illegal search is too connected to the illegal search. The consent is tainted. It's invalid. As long as Delgado has good law, I think this court has to follow Delgado in this case and reach the same result. And did you argue that tape connection below, as opposed to the coercion, has a basis for challenging the consent? Well, I think that it's not a voluntary consent when the police are already basically the cat is out of the bag. So whichever pigeonhole you want to use, it's essentially the same thing. It's not valid. It's not voluntary free consent because it's obtained as a result of an illegal search and the fruits of that search that have already been obtained immediately before. The FBI agent who the government presented at the suppression hearing, was he the person on the scene at the time? And did he actually give the order to the SWAT team to proceed into the house? No, Your Honor. He got to the scene after they had already gotten the defendant and his wife out. He said when he arrived there, the defendant was already in handcuffs. So he was present when the subsequent search was conducted, but he really had nothing to do with the SWAT team's protective sweep. He wasn't in the house. He was learning about that from other people. Yeah, but his entire testimony appears to be hearsay in many ways. Well, it is, Your Honor. That's correct. And when the SWAT team people actually testify at trial, what they say is at some variance with what he had to say as to what they found on the first and then the second of the protective sweep. That's exactly right, Your Honor. Agent Whitney, who was one of the SWAT team members, did testify at trial. They really did two protective sweeps, and Rivera was not privy to any of that. He's the witness who testified at the hearing, and that's why defense counsel at trial sought to remove the suppression motion that was denied by the trial judge. What's our case law for thinking about the second sweep when one sweep has been done? What's your question, Your Honor? How do you understand our case law with respect to how we're supposed to evaluate? Let's say we thought there might have been a reasonable basis for the first sweep, and I understand the arguments of why we shouldn't think that. But if we did, I understood protective sweep as a cursory first sweep. It just seems odd to say, well, now we're doing a second protective sweep so we can be thorough. Well, I think you're right, Your Honor. I think if you look at what the Supreme Court said in Bowie, where it's supposed to be a cursory search just for where people are hiding, I think if you look at what Agent Whitney testified to at trial, he sort of said, well, the first time we just kind of went around in different rooms. The second time we looked between the mattress and the box spring. So it really is a factual determination by the court as to whether or not that's going to fit within that cursory rubric or not. It's very fact-specific. But the evidence you want to suppress the large amounts of cash and the banding on the cash which refers to the bank that was just robbed, was that found on the second protective sweep? As it turns out, Your Honor, based on Agent Whitney's testimony at trial, it was because it was found between a mattress and a box spring. That's my understanding. That's when it was found. And they justified that by saying, well, we had to be sure there wasn't a man lying between the mattress and the box spring. I forget which one. Was there some case where this court actually upheld that there was somebody hiding between a mattress and a box spring? So it has happened, I guess, in the past. I thought that was the reason given for the lifting up of the mattress. Yes, it was, Your Honor. But as the court saw it, I'm going to say you have no right to be in there in the first place. Do you have a case of a person hiding in a toilet? I haven't seen that one yet, Your Honor, but you never know. I thank the court. Good morning, Your Honors. Mr. Castrone. Good morning. Attorney Rafael Castrone, Court Reporting Counsel for Appellant Serrano Cervejo. Your Honor, I would like to concentrate on the issue of the unnecessary presentation of highly prejudicial hearsay information under the false guise of providing background information. I'll go straight to the heart, the most serious, egregious comment made when the supervisor of Isidro Vasquez was testifying. He was asked, and once you made your work plan, what did you and Mr. Sanchez produce to do? That is an actual question. What did you produce to do? Instead of answering what he did, which, after he gave them proper information, he finally said, we went to look for the white van, which is what he should have said when he was asked that question, what did he do? He told the jury, according to the information that was given to me by the person, he told me, objection, and what does a judge do? The judge asks who? He told me the names of the persons who were going to commit the robbery and the vehicle that they were going to use. That's not background information. In fact, that was an unresponsive answer to a question. What would you do? We went to look for the white van. And for the white van, you don't need background information. Why? Because the security guard at the bank reported that a white van had left the bank after the robbery occurred. So this was totally unnecessary, and this was falsely presented to the court as background information. Let's continue, because it's not one isolated question. This is repeatedly occurs. The second example, what happened on a jury level? Anything extraordinary? Well, what happened was a bank robbery occurred at the Oriental Bank in San Lorenzo at 8.30. But what does the witness testify? Unnecessarily that at 6 o'clock an informant called him and informed him that a bank robbery was going to occur. They did nothing when they received that information. The whole matter started when the bank robbery occurred. And what should have been said, well, a bank robbery occurred at 8.30 in the morning at the Oriental Bank in San Lorenzo. And we proceeded to investigate with the information we had available. The informant was totally unnecessary. It's not background information. It's prejudicial accuracy. Let's go to the third example. The witness had already identified, following your Honor's opinion in Mayhear, the witness concerning the Brunatino, Sanchez, A.J. Sanchez testified that they had received information about Brunatino. They had received information. That's in line with your Honor's opinion in Mayhear that suggested to seize the burden of acting upon information received. After that had already been presented, they continued to insist on the improper hearsay about the informant. When Supervisor Richard is, when we've already talked about the Brunatino, he is asked, what happened was you and Sanchez were in the area? Again, it's an action question. What did you do? Well, we were heading towards San Lorenzo and we noticed a Brunatino, which I already knew. The prosecutor should have left that there. They had already established that they had information and they had acted upon information concerning the Brunatino. No? Well, the prosecutor assumed. She asked, who do you mean by you already knew? Provoking again. I knew it had been an issue. Objection, Your Honor. Stay. Okay? And then, let's go to another one. When they're at a meeting with the FBI agents organizing their plan, they unnecessarily block the informant in by asking the question that one of the agents asked the supervisor, how do you obtain that information? That was unnecessary background information. What's the theory of prejudice of adding the source of the information in to these answers? Well, it's cumulative, Your Honor. You just can't take an isolated incident. I think that when you end up telling the jury that the informant identified who the Roberts were and what vehicles they were in. And Melendez, Frederick Melendez, a case in one, just for sending one comment in this court-funded reversible error. In this case, Judge Percival has provoked that improper testimony, which I consider the most prejudicial in this case. I can go on to a couple. I'll go on to two if you want. Thank you, counsel. Thank you, Your Honor. Good morning, Your Honor. May it please the court, Nicholas Cannon on behalf of the United States. I'll address first, obviously, the protective sweep. And I think it's important that the government clears up what our position is with regards to the hot pursuit and how that relates to the scope of the protective sweep.  We have received the testimony from Agent Rivera regarding what had occurred, the background of this kind of day-long manhunt for the suspected three individuals. And at the time the SWAT goes to enter the home, they have a cell phone pinging, GPS coordinates of a cell phone that they knew belonged to Mr. D.S. and Ms. And they are going to, at that point, enter the home in pursuit of who they believe to be an armed felon. They know at that time that there's two firearms used during the robbery. They've recovered one feet away, really, from the house when they arrested Mr. Serrano. And so that's the purpose of our argument that they were permitted to go in the house to look for D.S. and Ms. They breach the door. They hear individuals talking. And it's at that time that they offer them to come out. For everyone's safety, it's obviously preferable if people will surrender to law enforcement. Mr. D.S. Jimenez and his wife, his wife's actually the first one, they come out. They also hear toilet flushing, which obviously in and of itself wouldn't be enough to... They hear the toilet flushing before they come out. That's correct, Your Honor. I was just adding that at the time they're hearing conversations, they also hear the toilet flushing. I didn't want to forget that.  Yes, Your Honor. Then the wife comes out, and then Mr. D.S. Jimenez comes out. It's at this time that SWAT then enters the home to do their protective sweep. Two things I think are important about this protective sweep. I know that Agent Whitney said there was essentially two sweeps. He says they do a cursory sweep where they look into the rooms of the house to make sure there's no individuals in there, and then they do a more thorough protective sweep, which encompasses other places that individuals could be hiding. And I think for this court, the question is whether or not all of that was permissible under Booey and his project. Well, isn't the question whether there was a reason, once the two of them came to the door, was there a reasonable suspicion to believe that there was a threat to the officers inside the house to justify any sweep at all? And I haven't heard you yet point to anything that would generate such a reasonable suspicion, and doesn't that mean you lose unless there is a reasonable suspicion? We would lose, yes, Your Honor, and I'll guess that. I just wanted to give some background to the hot pursuit portion of it, because I think that is necessary for SWAT to approach the house and breach the door. I think that that is... But the issue isn't breaching the door here. The issue is after the couple came, they had them in custody. They had two of them. There's no testimony. They heard more than two voices inside the house. They had a live action confidential informant on real time telling them about the two people, two people, two people. They already had the other guy accounted for. Why did they go in the house? All right. I have three points, Your Honor, to make about what differentiates this from Delgado Paris. The first one is that this conclusion that there was a third person involved in the bank robbery is a reasonable one. It was based on specific facts that the agents had at the time. They had interviewed fact witnesses, and this is all part of the suppression witness, and Agent Rivera actually interviewed himself, that said that the van was waiting for the two gunmen outside. It didn't say it was parked. It said it was waiting for them outside. They boarded it extremely quickly and were able to get away from the bank in seconds. That combined with what happens at the house, and that is that they hear, when they approach the door, they hear people talking. Unlike Delgado Paris where there was no evidence that there was another individual in the house, they now know that there's more than one person. And differentiating between two and three people is much more difficult, I think, than differentiating between one and two people. They hear this talking, and then additionally they hear the toilet flushing. Given those three circumstances and the police officers' experience, the FBI agents' experience, they believe that there was a third person involved in the bank robbery. But you can't even say they believe because you didn't have a witness who said anything about what he believed or not. You had an after-the-fact guy who speculated as to what they were thinking. Well, Agent Rivera said at the time. But he didn't make the decision to go in, right? No, he did. Agent Rivera was on the scene. I thought it was after the first sweep. No, no. He was on the scene, I think, I don't remember the distance away. He's there. He was actually instructing. He called in for SWAT. He instructed the entry team to go in. He's the supervisory agent of this entire operation. He's not there during the breach, Your Honor. You're correct. He doesn't go into the house to do the sweep. But he's on the scene. He actually is there when... Did he or did he not make the decision to do the initial protective sweep? I think he did, yes, Your Honor. He told SWAT that they had to go in and clear the house. That was his instruction. So he was there. He arrived then between the couple coming to the door and them first going in? No, I think that decision, and that was part of why I wanted to give the background about the hot pursuit. That decision to enter the home was made prior to... Well, then that's even worse for you. I don't believe so. It was made before the talking, before the toilet, before anybody knew. They wouldn't know. They weren't telling us they were going to go in there no matter what they found. No, they were going to go in to arrest the NCMS. How does that help you with them having reasonable suspicion to do the sweep once they've effected the arrest? And that's where I think then you have the circumstances of what occurs at the front door. Well, that's Judge Kerr's question, which is what is Rivera's knowledge that connects to the decision to go in based on the talking? Does Rivera hear them talking? No, but Rivera has conveyed the circumstances of the bank robbery to SWAT. We believe that there's a third party... Does he testify that he did that? I don't remember specifically what he says. I do know that he testifies that he had made the decision based on this information to involve SWAT and have them go in and... With respect to the protective sweep, not the decision to go in to effect the arrest, who makes that decision? I'm assuming the SWAT team on the scene at the time. Okay, and is there any testimony that Rivera told those SWAT team members that there is a third person involved in the robbery? I don't believe so, but I'm assuming from the record and from just what I recall from the special hearing that yes, that information had been portrayed to everybody in law enforcement. And they also... But the question is, is this in the record? I believe it is, Your Honor. That Rivera told them there was a third person involved in the robbery? I think he uses the language we were operating under the assumption there was a third party, and maybe I'm reading too much into that, but that means all law enforcement is aware of this information. This was a... But there's no person who actually made the decision to do the protective sweep who testifies that because we couldn't distinguish the talking as to how many people were involved in it, that's why we went in. No, there's no one that says that, Your Honor. Isn't that a problem? I... Because you're asking us to conclude that they had a reasonable basis for going in because they couldn't distinguish between the people talking, but we have no idea whether that actually was a problem. For all we know, they heard a man talking to a woman, and then they brought a man and a woman out, which would suggest that they didn't have a problem distinguishing. We just know they heard talking. Yes, Your Honor, that's correct. And what's the basis of the record to conclude that it was reasonable for them to suspect that the people they heard talking were three people? There's nothing that says that it was three people or just two people. You're absolutely right. It's just that there was people, they heard people talking. But the test is you have to have articulable, reasonable suspicion. What you're saying is no one articulated anything on this. No, I... Yes, but I believe that from the... What officers knew from the facts of the bank robbery, that there was articulable suspicion for them, and I'm confident that Agent Rivera conveyed this to the other law enforcement. This is a pretty fluid investigation. This was all within eight hours, and everyone was... What precisely do you mean when you tell us that you're confident that something happened that isn't in the record? What are we to make of that? I just mean that in my experience and with the experience of law enforcement, they're in constant contact with each other. And that's in the record. They were in contact with the helicopter that was above explaining what the house looked like. They were in contact with each other when they arrested... But the most... You might say you can impute knowledge of one to others. We have cases saying that type of thing. But you need to have articulable, reasonable suspicion that the things that happened in the house that the SWAT team members heard gave them articulable, reasonable suspicion to think that the third person who they knew was around was in that house. And Judge Lynch's questions to your opponent sketched out arguments as to why there might be no reasonable basis to think that that third person would have been in the house. Your answer to us was, yeah, but when they heard the talking, that might have sounded like three people. But there's nothing in the record to suggest that the person who made the decision to go in the house thought that, because that person never testified. And I didn't mean to insinuate that when they heard the talking, they knew there were three people. I was merely pointing out that they knew at that point they were dealing with more than one person. Two! If it's two, it's a big problem for you. It has to be more than two. And most people can tell the difference between a woman's voice and a man's voice. Or are you saying they just heard enough noise to make them think it was two people? Anyway, you know, it was the government's choice who to present at the suppression hearing. You did not present the SWAT team members or the head of the SWAT team. Rather, you presented someone who had second-hand information. And I read his testimony, and these points are not at all clear. The assumptions you're making are ones that the government could easily have talked about, but it's not in the testimony. Well, I mean, if I could briefly respond, Your Honor, to what he said. Do you want us to draw all inferences in favor of the government when, in fact, it's your burden to come up with articulable suspicion? No, Your Honor. I'm not asking the court to do that. I just believe that based on the totality of the circumstances of this day, which was essentially a day-long pursuit, when you look at all of those factors combined, the fact that we knew that there was two weapons involved in the bank robbery, one of those was unaccounted for. We knew that the individual responsible for the bank robbery, based on the information we were receiving from the GPS, was inside of that house. When you combined all of that, it does give the law enforcement a basis, a reasonable basis just to enter for the mere purposes of making sure that there's no one else in that house that can harm them. And that's what happened. And once that occurs, they exit, SWAT leaves the scene, and consent is given by both the wife and Mr. GSMX. They go in twice. Are we agreed on that? No, they don't go in twice. They're in the house the entire time. Even Whitney's testimony at a trial... Okay, they make one sweep... Yes, Your Honor. And then without coming outside, without reporting to anyone, they make a second sweep, and this time they poke their heads in the toilets and they lift up the mattresses? I would classify... Agent Whitney says it's a second sweep. I think it's a continuous sweep, and they are permitted under the law to look in any place that a person could hide. How they do that, how they effectuate that, if it's room by room or one floor and then a second floor, I don't think it really matters for the constitutionality of it. What matters is did it exceed the scope of what is permissible. Okay, thank you. Thank you, Your Honor. I'll be very brief. The court obviously understands the issues. It's the government's burden. The presumption favors a defendant. It's a warrantless entry. I should point to a couple of points in the record since that came up in the court's questioning of the prosecutor. So on pages 116 and 117 of the appendix of the defendant's brief is where Rivera is questioned, and he's asked specifically, the question is, did you receive any information that there was a third person? Answer, no, sir. Not a third individual? Answer, I didn't. I didn't get that information. Question, okay. Answer, that doesn't mean there wasn't a third person. Well, that's obviously not good enough. And the other thing I just want to say is I think what's really going on here is the record was clear in Delgado. And Delgado was actually testimony, according to the court's decision, that the protective sweep is a standard practice of the officers, at least in Puerto Rico. And on page 97 of our appendix, when asked about why a protective sweep was done, Rivera says, we conduct this as a safety procedure. This is not a search just to make sure nobody else was hiding at the location. So he doesn't say standard practice. I'm inferring that basically that's just what they do. As we've indicated, there were no specific articulable facts. Therefore, there was not a valid entry. But apparently this is what they do as a standard practice until they finally hear this court and stop doing it. Thank the court. Thank you, counsel.